**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THOMAS R. HARTMAN, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>KEITH THOMPSON, *et al.*,<br><br>        Defendants. | Case No. 21 C 1409<br><br>Hon. LaShonda A. Hunt |

**MEMORANDUM OPINION AND ORDER**

Following a trucking accident, Plaintiffs Thomas R. Hartman ("Thomas"), Kristy Michaud-Hartman ("Kristy"), J.H., E.H., and R.H. ("minor children")[1] (collectively, "Plaintiffs"), brought this diversity action for negligence and other related causes of action against Defendants Keith Thompson ("Thompson"), Western Express, Inc. ("Western"), S&L Cartage, Inc. ("S&L"), and LG Express Group, Inc. ("LG"). Plaintiffs have moved for partial summary judgment on Count III against Defendant S&L (Dkt. 169), and Defendant Western has moved for summary judgment on Counts IV, VII, VIII, IX, and XIII against Plaintiffs (Dkt. 172). For the reasons discussed below, both motions for summary judgment are granted.

**BACKGROUND**[2]

**I.    Accident**

On July 27, 2019, in Eagle County, Colorado, Thomas was driving a Ford SUV, towing a trailer, westbound on I-70 in which his wife, Kristy, and their three minor children, were passengers.

---

[1] J.H., E.H., and R.H. are minors and bring this suit by and through Kristy, their guardian *ad litem*.

[2] The relevant facts are taken from the parties' respective Local Rule 56.1 statements and are undisputed unless otherwise noted. For brevity, the Court refers to Plaintiffs' Response to Defendant Western's Statement of Material Facts as "Dkt. 189," Western's Response to Plaintiffs' Additional Statement of Material Facts as "Dkt. 198," S&L's

(Dkt. 189 at ¶ 9; Dkt. 258 at ¶ 1). At the same time and place, Defendant Thompson was driving a semi-tractor and trailer ("commercial motor vehicle" or "CMV") westbound on I-70 at a high rate of speed. (Dkt. 189 at ¶ 10; Dkt. 258 at ¶ 2). Thompson rear-ended Plaintiffs' vehicle, causing it to roll over and up the embankment on the side of the road, seriously injuring all five Plaintiffs. (Dkt. 198 at ¶ 1; Dkt. 258 at ¶¶ 2-3).

**II.     Relationships Between Defendants and Third Parties**

At the time of the accident in July 2019, Thompson was employed by Defendant LG and was operating the CMV in the course and scope of his employment and on behalf of LG. (Dkt. 189 at ¶¶ 12, 52; Dkt. 258 at ¶¶ 4-5; Dkt. 259 at ¶ 13). When he rear-ended Plaintiffs, Thompson was transporting a shipment of forklifts manufactured by and belonging to Hyster-Yale Group ("Hyster") from Berea, Kentucky to North Las Vegas, Nevada. (Dkt. 189 at ¶¶ 10-11; Dkt. 258 at ¶ 7).

Before the accident, Hyster had hired Ryder Integrated Logistics, Inc. ("Ryder") to procure transportation for the shipment. (Dkt. 258 at ¶ 8). Acting as Hyster's agent, Ryder hired Defendant Western to transport the shipment pursuant to a June 18, 2012 contract between Western and Ryder titled "General Terms and Conditions (Motor Carrier)." (Dkt. 198 at ¶ 3; Dkt. 258 at ¶ 9). Western was registered and authorized by the Federal Motor Carrier Safety Administration ("FMCSA") as both a freight broker and a motor carrier and had operating authority from the United States Department of Transportation ("DOT") to provide interstate brokerage services and transport shipments as a motor carrier. (Dkt. 189 at ¶ 13; Dkt. 258 at ¶¶ 11-12).

---

Response to Plaintiffs' Statement of Material Facts as "Dkt. 258," and S&L's Statement of Additional Material Facts as "Dkt. 259." Plaintiffs did not file a response to S&L's Statement of Additional Material Facts.

The parties hotly contest whether Western acted as a broker or a motor carrier here;[3] nevertheless, it is undisputed that Western hired Defendant S&L to transport the load pursuant to a contract the parties had executed in 2018. (Dkt. 189 at ¶ 34; Dkt. 198 at ¶ 52). In exchange for transporting the shipment, Western would pay S&L a flat rate of $3,200. (Dkt. 198 at ¶ 55). At all times relevant to this case, S&L was an authorized motor carrier with operating authority from the DOT. (Dkt. 189 at ¶¶ 33, 37).

S&L attempted to transport the shipment in its own truck, but that truck experienced mechanical problems and could not be used to complete the job. (Dkt. 189 at ¶ 47; Dkt. 258 at ¶ 25). As a result, by the time the load was picked up in Kentucky on July 25, 2019—two days before the accident—S&L and LG had entered into a contract titled "General Contract for Services" ("S&L-LG Contract") under which LG agreed to transport the shipment from Kentucky to Nevada as a motor carrier. (Dkt. 189 at ¶ 48; Dkt. 258 at ¶ 31; *see also* 9/14/22 LG Dep. Tr., Western Express Ex. 8, Dkt. 171-7 at 2896-99). LG was authorized by the FMCSA as an interstate motor carrier and had operating authority from the DOT. (Dkt. 259 at ¶ 3).

The S&L-LG Contract did not specify any particular driver to be used or route to be taken to deliver the load, nor did it provide details about the delivery beyond the final location. (Dkt. 259 at ¶ 8; 9/14/22 LG Dep. Tr., Western Express Ex. 8, Dkt. 171-7 at 2896-99). According to the S&L-LG Contract, S&L would pay LG $3,200 upon the completion of LG's services, the same amount S&L was to be paid by Western for transporting the shipment. (Dkt. 259 at ¶ 9; 9/14/22 LG Dep. Tr., Western Express Ex. 8, Dkt. 171-7 at 2897; 9/14/22 LG Dep. Tr., Western Express Ex. 4, Dkt. 171-7 at 2893 (identifying the "flat rate" as $3,200)).

---

[3] As discussed *infra*, because that dispute need not be resolved by the Court at this time, facts relevant to the issue are omitted from this opinion.

S&L acted as a motor carrier when it subcontracted with LG to haul the load. (Dkt. 258 at ¶ 26). According to Samir Jakupovic, an owner of both S&L and LG (*id.* at ¶ 27):

> [W]hen the truck broke down, usually the carrier ask us what are we going to do about it, can we recover the load ourselves or do we have to give it to another carrier. In this case, we have trucks, LG trucks, close by. So, you know, not to waste time, you know, we told we can deliver that load with the LG truck.

(9/14/22 S&L Dep. Tr. at 26:4-11, Dkt. 171-9 at 2943).

S&L and LG were two separate Illinois corporations that maintained separate corporate statuses and operations. (Dkt. 259 at ¶¶ 1-2, 4). Although both corporations are now dissolved (*id.*), during the time period relevant to this case, S&L and LG were located in the same building, used the same truck terminal, and did not segregate their trucks at the terminal. (Dkt. 258 at ¶ 28). Even so, the companies maintained different office floors in the building and had separate fleets of equipment, employees, dispatchers, and dispatch operations. (Dkt. 259 at ¶¶ 4, 11). LG was responsible for hiring, qualifying, and supervising its own drivers, as well as for paying their salaries and benefits. (*Id.* at ¶¶ 5-6). Further, LG was responsible for its own DOT compliance, employee training, and safety. (*Id.* at ¶ 7). According to S&L, Thompon was never employed by S&L, nor did he ever get "loaned out" to drive one of S&L's trucks and loads. (*Id.* at ¶ 12). S&L denied that Thompson was operating the CMV with its permission, authority, or consent. (*Id.* at ¶ 10).

Western did not know and was not informed by S&L at any time prior to the accident that S&L had reassigned the load to LG or entered into a contract with another motor carrier pertaining to the load. (Dkt. 189 at ¶ 49). Western did not hire LG or Thompson, nor did it have any knowledge of the existence of LG or Thompson before the accident. (*Id.* at ¶¶ 54, 56-57). At no time was there any communication between Western and Thompson, and Western has never been a party to any

contract with LG. (*Id.* at ¶ 59). Western did not learn of the accident until two days after it had occurred. (*Id.* at ¶ 71).

The CMV that Thompson was driving at the time of the accident was owned by ILG International Group, Inc. ("ILG"), which had leased the vehicle to LG. (Dkt. 189 at ¶ 12; Dkt. 258 at ¶ 6). Western did not own or lease the tractor or trailer involved in the accident, nor did S&L. (Dkt. 189 at ¶ 62; Dkt. 258 at ¶¶ 32, 36). The CMV displayed LG's name and DOT number at the time of the crash, not S&L's. (Dkt. 189 at ¶¶ 12, 53; Dkt. 258 at ¶¶ 37-38).

## **LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Materiality is guided by substantive law; a fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Where . . . the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisfy these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim. . . . If the movant has failed to make this initial showing, the court is obligated to deny the motion." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). In cases where the movant does not bear the burden of proof, the movant must simply point to an absence of evidence to support the nonmovant's case. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir.

2013). The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial," *Celotex*, 477 U.S. at 324, and support their position with "more than a scintilla of evidence." *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 709 (7th Cir. 2000). Reliance on the pleadings alone is not enough for a nonmovant to defeat a motion for summary judgment. *Celotex*, 477 U.S. at 324.

The court must draw all "justifiable" inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 155; *see also Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (non-moving party receives "benefit of conflicting evidence" as well as "any favorable inferences that might be reasonably drawn from the evidence."). A court may, but is not required to, consider other materials in the record when determining whether summary judgment is appropriate. Fed. R. Civ. P. 56(c)(3). Finally, a court must refrain from weighing evidence, drawing inferences, or making credibility determinations. *Johnson v. Advocate Health & Hosps., Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

## DISCUSSION

Before the Court are two motions for summary judgment. Plaintiffs seek partial summary judgment on the issue of whether S&L was a "statutory employer" of Thompson at the time of the accident (Count III), thus rendering S&L vicariously liable for Thompson's actions. (Pls.' Opposed Mot. for Summ. J. at 2645, Dkt. 169).[4] In response, S&L requests an affirmative determination that it was not Thompson's statutory employer as a matter of law and, consequently, dismissal of Count III pursuant to Rule 56(f). (Dkt. 260 at 7816). Defendant Western also seeks entry of summary

---

[4] Unless otherwise noted, page numbers in citations to the docket reference "PageID #" in the CM/ECF header of the filing, not other page numbers in the header or footer of the document. For brevity, the Court refers to Plaintiffs' Memorandum in Support as "Dkt. 170," S&L's Response as "Dkt. 260," Plaintiffs' Reply as "Dkt. 261," Western's Memorandum in Support as "Dkt. 174," Plaintiffs' Response as "Dkt. 187," and Western's Reply as "Dkt. 199."

judgment against Plaintiffs on each claim asserted against it—statutory employment (Count IV), institutional negligence (Count VII), *respondeat superior* (Count VIII), negligent selection (Count IX), and joint enterprise (Count XIII). (Western Express Inc.'s Mem. of Law in Supp. of Mot. for Summ. J at 3643-3672, Dkt. 174). Because the motions involve overlapping factual allegations and legal authority, the Court addresses them simultaneously.

## I.    Counts III (S&L) and IV (Western) – Statutory Employment

Plaintiffs contend that S&L and Western each constitute a statutory employer of Thompson who is vicariously liable for his alleged negligence and resulting damages. (Second Am. Compl. at ¶¶ 59-190, Dkt. 111). Specifically, Plaintiffs allege that S&L and Western were "required to comply with 49 C.F.R. §§ 376.11, 376.12, and/or 376.22." (*Id.* at ¶¶ 113, 182).

The concept of statutory employer liability was created as a means of holding motor carriers responsible for torts when the motor carrier "use[d a] motor vehicle" it did not own "to transport property under an arrangement with another party." *Dewey v. K Split Logistics LLC*, No. 21 C 3505, 2025 WL 965140, at *2 (N.D. Ill. Mar. 31, 2025) (quoting 49 U.S.C. § 14102). "Courts have explained that [specific] statutes [*i.e.*, 49 U.S.C. § 14102] and regulations [issued pursuant to the relevant statutes] are intended to ensure that motor carriers can be held liable for negligence related to the trucks they use and the drivers of those trucks, 'even when an employment relationship does not technically exist,' thereby creating what is known as 'statutory employer liability.'" *Id.* (citations omitted).

Some courts have labeled 49 C.F.R. §§ 376.11 and 376.12 as "responsibility and control" regulations and categorized them as a "theory" of statutory employment. *See, e.g.*, *Morales v. OK Trans, Inc.*, No. 2:19-CV-00094, 2024 WL 1348405, at *2 (S.D. Tex. Mar. 29, 2024); *McKeown v. Rahim*, 446 F. Supp. 3d 69, 77-78 (W.D. Va. 2020). "Under the responsibility and control theory,

an entity is a statutory employer if four conditions are met: (1) the entity is a motor carrier and not a broker; (2) it does not own the vehicle involved in the accident; (3) it is using the vehicle in interstate commerce; and (4) it does not employ the driver." *Morales*, 2024 WL 1348405, at *2. *Accord Dewey*, 2025 WL 965140, at *2.

As an initial matter, both S&L and Western argue that Plaintiffs' statutory employment claims fail because the FMCSA and regulations promulgated thereunder do not create a private cause of action for personal injury claims. (Dkt. 174 at 3649-59; Dkt. 260 at 7804-06, 7815-16). But Plaintiffs maintain that their cause of action arises under negligence, not federal law, and the concept of statutory employment under 49 U.S.C. § 14102 and related definitions applies to personal injury cases like this one. (Dkt. 187 at 3814-15; Dkt. 261 at 7823-24). Having reviewed the legal authority, the Court agrees with Plaintiffs. Since their claims are grounded in tort law—negligence—not federal law, the objections of Western and S&L about the availability of a private remedy miss the mark. The Court now turns to the merits.

A.  **Western Was Not Thompson's Statutory Employer**

While Plaintiffs are not prohibited from pursuing a private cause of action for statutory employment against Western, the undisputed facts demonstrate that Western was not Thompson's statutory employer. The parties spill much ink over whether Western acted as a broker or a motor carrier for the shipment at issue in this case, but resolution of that specific question is not essential to the analysis. If Western acted as a broker, by definition, it could not have been Thompson's statutory employer. Even assuming for the sake of argument that Western acted as a motor carrier, the record still does not establish that Western "used" the CMV involved in the accident.

It is undisputed that Western never owned or leased the CMV. "Absent a lease or ownership, Plaintiffs . . . cannot[] explain how [a defendant] 'used' the truck that was involved in the accident.

And if [defendant] did not 'use' the truck, then [defendant] cannot be a 'statutory employer' under federal law." *Dewey*, 2025 WL 965140, at *2. That said, a lease is not the dispositive factor. *See, e.g.*, *Puga v. About Tyme Transp., Inc.*, 227 F. Supp. 3d 760, 764 (S.D. Tex. Jan. 3, 2017) ("[W]hether the drivers are called direct employees, independent contractors, or owner-operators . . . if the carrier hires them to transport a shipment, they are the carrier's statutory employees and the carrier has statutory control over the equipment and driver to support vicarious liability. . . . It is the fact of '**use**' that triggers the vicarious liability imposed . . . .") (emphasis added). Rather, there must be some evidence in the record that Western "used" the CMV at issue. The Court has found nothing here.

Plaintiffs summarily assert that Western "used the LG [t]ruck and Thompson to transport the [s]hipment. (Dkt. 187 at 3813-14). But in advancing this argument, Plaintiffs focus only on how Western arranged to use S&L's truck, not LG's, which lends credence to the Court's conclusion that Western never "used" the truck or driver involved in the collision. (*Id.*). Nor could it have done so when neither side disputes that Western did not know about LG or Thompson until days after the accident. It defies common sense to suggest that Western used, or arranged to use, a truck and driver it did not know existed. *See, e.g.*, *Dewey*, 2025 WL 965140 at *2 (granting summary judgment to a carrier after finding no statutory employment under 49 U.S.C. § 14102 and related regulations between parties who had no knowledge of each other at the time of the accident).

Accordingly, Western is entitled to summary judgment on Count IV.

**B.**     **S&L Was Thompson's Statutory Employer**

The parties agree that S&L acted as a motor carrier, rather than a broker, in this case. S&L admits it has no legal authority to act as a broker and that Western hired it to transport the shipment as a motor carrier. S&L similarly did not own or lease the CMV involved in the accident; thus, as

with Western, the question again is whether S&L "used" the truck to transport property under an arrangement with another party. The Court finds that it did.

Simply put, the facts in the record demonstrate that motor carrier S&L subcontracted with LG to transport the shipment from Kentucky to Nevada (which is, of course, interstate transportation) after S&L's truck broke down. In other words, S&L and LG executed a contract—a binding agreement—pursuant to which LG would transport the shipment in a CMV that S&L did not own with a driver S&L did not employ, and S&L did so to fulfill its obligation to Western. That is a quintessential example of "use." S&L nonetheless tries to stave off summary judgment by arguing that "a lease that transfers responsibility to the alleged statutory employer" is required under 49 C.F.R. § 376.12 and S&L never took possession of the CMV. (Dkt. 260 at 7807-08). But "use" as opposed to a lease confers statutory employment status, and a statutory employer need not take actual possession of equipment to "use" it. *See, e.g.*, *Puga*, 227 F. Supp. 3d at 763-64. S&L owner Jakupovic testified that "[i]n this case, we have trucks, LG trucks, close by. So, you know, not to waste time, you know, we told we can deliver that load with the LG truck." No reasonable jury could find based on those admissions that S&L was not "using" the CMV and Thompson pursuant to an agreement with LG.

Accordingly, Plaintiffs are entitled to partial summary judgment on Count III.

## II.    Count VII (Western) – Institutional Negligence

Western moves for summary judgment on the grounds that (1) Count VII is time barred; (2) and even if it is not, institutional negligence claims in the trucking/motor vehicle accident context are not recognized in Colorado; (3) but even if they were, the undisputed facts demonstrate that this claim must fail. (Dkt. 174 at 3659-62). (*See* Second Am. Compl. at ¶¶ 229-248). Plaintiffs argue the claim is not time barred because it relates back to the filing of their original complaint and the

claim is for negligent training and supervision, which both Colorado and Illinois recognize. (Dkt. 187 at 3821-23). Western has the better argument.

Assuming for the sake of argument that Count VII was timely pled, the Court did not find a single instance in either Illinois or Colorado where the tort of institutional negligence was recognized in a context remotely similar to the circumstances presented here. As Western points out, institutional negligence claims almost exclusively apply to claims of medical negligence against hospitals and practitioners. Instead of addressing this shortcoming in their theory, Plaintiffs counter that Count VII is for "negligent training and supervision" despite the cause of action being clearly labeled in the Second Amended Complaint as "Institutional Negligence." Regardless of how Plaintiffs frame this claim, the cases they cite demonstrate why Count VII fails. *See, e.g.*, *Kahland v. Villarreal*, 155 P.3d 491, 493 (Colo. App. 2006) ("[A] claim for negligent hiring, training, and supervision is based on the employer's failure to discover that the employee created an undue risk of harm to others."); *Kreher v. Polaris Indus., Inc.*, No. 20-cv-126-DWD, 2020 WL 7263285, at *2 (S.D. Ill. Dec. 10, 2020) (noting only "general foreseeability" is required in the employment context for claims of negligent supervision). *See also Connes v. Molalla Transp. Sys., Inc.*, 831 P.2d 1316, 1321 (Colo. 1992) ("[L]iabilty [for negligent hiring] is predicated on the employer's hiring of a person under circumstances antecedently giving the employer reason to believe that the person, by reason of some attribute or character or prior conduct, would create an undue risk of harm to others in carrying out his or her employment responsibilities.").

The fact remains that Western did not know that LG or Thompson *existed* until *days* after the accident. Once again, it defies common sense to insist that Western would have any duty to train and supervise Thompson. Western could not have discovered that Thompson, whom it did not know existed, created any undue risk of harm or had any attribute, character, or prior conduct that

11

would suggest the creation of such undue risk. And Thompson certainly was not foreseeable to Western. Plaintiffs argue that Western "knew it was using S&L to transport the Shipment, so it had a duty to know who was driving the truck" and "[h]ad Western supervised Thompson, it would have known he needed training to transport the Shipment over the mountains in Colorado." (Dkt. 187 at 3821-22). But the Court reiterates that it fails to see how Western would have known who was driving the truck, or that the driver required additional training or supervision, when S&L did not disclose its use of LG and Thompson until after the accident had already happened.

Accordingly, Western is entitled to summary judgment on Count VII.

## III.     Count VIII (Western) – *Respondeat Superior*

Plaintiffs' *respondeat superior* count against Western (Second Am. Compl. at ¶¶ 249-439) fares no better than Counts IV or VII. Western contends that it is entitled to summary judgment because no employment relationship existed between Western and Thompson. (Dkt. 174 at 3662-68). The Court agrees.

"Under Illinois law, a respondeat superior claim requires a showing that: (1) an employer/employee relationship existed; (2) the principal controlled or had the right to control the conduct of the alleged employee; and (3) the alleged conduct fell within the scope of the employee's employment." *Slabon v. Sanchez*, No. 15-cv-08965, 2020 WL 5763760, at *28 (N.D. Ill. Sept. 28, 2020). The same is true under Colorado law. *See, e.g.*, *Daly v. Aspen Ctr. for Women's Health, Inc.*, 134 P.3d 450, 452 (Colo. App. 2005) ("The doctrine of respondeat superior is based on the theory that the *employee* is the agent of the *employer*. . . . It requires a special kind of agency relationship— a master-servant relationship in which the *employer* has the right to control the *employee*'s performance.") (emphasis added).

The parties agree that Western did not employ Thompson, and the Court has already held that, as a matter of law, Western did not act as Thompson's statutory employer. Furthermore, since Western did not hire Thompson as an independent contractor, the Court need not consider arguments about whether a *respondeat superior* claim survives under those circumstances. Plaintiffs insist that a "jury reasonably could find S&L and Thompson were Western's agents." (Dkt. 187 at 3823-25). But that unfounded assumption is based on speculation that Western had the right to control S&L. Plaintiffs merely declare that "by having a right to control S&L, Western had a right to control Thompson" because "Thompson was S&L's statutory employee." (Dkt. 187 at 3825). However, neither the facts nor the law support those conclusory contentions.

Western is correct in asserting that "[i]t is axiomatic that an agency relationship cannot be created between two entities, or between an individual and an entity, when one does not even know of the existence of the other." (Dkt. 199 at 7470). At the end of the day, it is fundamentally unfair to hold Western responsible for the conduct of an individual about whom Western had no inkling, a principle reflected in the law of *respondeat superior*. *See, e.g.*, *Milliam v. N. Freight, LLC*, No. 20-cv-00797-JPG, 2023 WL 423114, at *1-6 (S.D. Ill. Jan. 26, 2023) (finding, in a factually analogous case, that there could be no agency relationship when a defendant had "no knowledge" of an entirely different company, with which it had no written agreement, who took over the hauling of the load).

Accordingly, Western is entitled to summary judgment on Count VIII.

## IV.    Count IX (Western) – Negligent Hiring/Selection

Plaintiffs raised a count of negligent hiring/selection in Count IX, which they "recognize . . . will be dismissed" pursuant to the Seventh Circuit's recent decision in *Ye v. GlobalTranz Enters.*, Inc., 74 F.4th 453 (7th Cir. 2023). (Dkt. 187 at 3825). The Court concurs that Count IX must be

13

dismissed based on Circuit precedent concluding that the Federal Aviation Administration Authorization Act preempts a negligent hiring claim brought as a common law tort claim.

Accordingly, Count IX against Western is dismissed on preemption grounds.

## V.     **Count XIII (Western) – Joint Enterprise**

Finally, Western moves for summary judgment on Count XIII alleging that Western and S&L were engaged in a joint enterprise. (Second Am. Compl. at ¶¶ 655-688). "A joint venture is an association of two or more entities to carry out a single, specific enterprise for a profit." *Lyons v. Wells*, No. 22-cv-1711-SPM, 2024 WL 3984074, at \*5 (S.D. Ill. Aug. 29, 2024). "Whether a joint venture exists is a matter of the intention of the alleged joint venturers" and "[e]ven in the absence of a formal agreement, the existence of a joint venture may be inferred from circumstances demonstrating that the parties intended to enter into a joint venture." (*Id.*). The following elements are considered when determining the potential joint venturers' intent: (1) whether there was an expressed or implied agreement to carry on the enterprise; (2) whether there was a demonstration of intent between the parties that they operate in a joint venture; (3) whether there is a "community of interest, as reflected in the contribution of property, money, effort, skill, or knowledge;" (4) whether there is a measure of joint control and management of the enterprise; and (5) whether there is sharing of profits and losses. (*Id.*). Each of these factors must be present for a joint venture to exist. (*Id.*).[5]

---

[5] The Court notes that Western highlights the fact that Colorado recognizes two types of joint ventures—joint business ventures and joint ventures in the operation of automobiles. (Dkt. 174 at 3670 (citing *Am. Family Mut. Ins. Co. v. AN/CF Acquisition Corp.*, 361 P.3d 1098, 1099 (Colo App. 2015)). The Second Amended Complaint alleges a joint business venture, not a joint venture in the operation of the CMV, so the Court need not address that type of venture. As a result, Colorado law and Illinois law on joint business ventures is relatively analogous, such that the analysis is not impacted by the choice of law. *See, e.g.*, *Brown v. No Double Dipping Inc.*, No. 22CA0991, 2023 WL 12061349, at \*5 (Colo. App. Nov. 9, 2023) ("To prove the existence of a joint business venture, Colorado courts require that a plaintiff establish three elements: (1) joint interest in property by the parties; (2) agreement, either express or implied, to share profits and losses of the venture, and (3) actions and conduct showing cooperation in the project.").

While Western and S&L operated pursuant to an executed contract in this case and questions may exist as to the extent of control that Western maintained over S&L (and the shipment of the load), Plaintiffs' joint enterprise claim fails because the record is devoid of facts showing that Western and S&L had a "community of interest" or shared profits or losses. Plaintiffs presented no evidence to show that "the jury could find Western and S&L were engaged in a joint venture" and fail to explain how S&L's receipt of a flat rate of $3,200 for services constitutes a "sharing of profits" rather than a flat fee payment for services. (Dkt. 187 at 3825-26). Because Plaintiffs cannot demonstrate each required element for the creation of a joint venture, under either Illinois or Colorado law, no reasonable jury could find that Western and S&L engaged in a joint enterprise.

Accordingly, summary judgment is granted in favor of Western on Count XIII.

## CONCLUSION

For all the foregoing reasons, with respect to Plaintiffs' second amended complaint, summary judgment is granted in favor of Plaintiffs and against Defendant S&L Cartage on Count III, and in favor of Defendant Western Express, Inc. and against Plaintiffs as to Counts IV, VII, VIII, and XIII. Count IX against Defendant Western Express, Inc. is dismissed as preempted by federal law.

**DATED**: September 18, 2025          **ENTERED**:

LaShonda A. Hunt
LASHONDA A. HUNT
United States District Judge

15